## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 29 2017, 10:35 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle Sheff
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Involuntary Termination of the Parent-Child Relationship of D.B., Minor Child, and S.B., <br><br> *Appellant-Defendant,* <br><br> v. <br><br> Indiana Department of Child Services, <br><br> *Appellee-Plaintiff* | December 29, 2017 <br><br> Court of Appeals Case No. 49A02-1707-JT-1635 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Marilyn Moores, Judge <br><br> The Honorable Larry Bradley, Magistrate <br><br> Trial Court Cause No. 49D09-1608-JT-916 |

**Altice Judge.**

## Case Summary

[1] S.B. (Mother) appeals the involuntary termination of her parental rights to D.B. (Child). Mother argues that the trial court's order terminating her parental rights is not supported by clear and convincing evidence.

[2] We affirm.

## Facts & Procedural History

[3] Mother has six children, the youngest of whom is D.B., born December 8, 2005. On December 23, 2014, the Department of Child Services (DCS) filed a child in need of services (CHINS) petition involving D.B. and two of her siblings (collectively, the Children), and the Children were removed from Mother's care. The CHINS petition was based on allegations of Mother's drug use, unstable housing, inappropriate living conditions, insufficient food, and educational neglect as to the older children. Indeed, at the time the Children were removed, Mother was unemployed and had tested positive for cocaine, and the family was living in a house with a male individual who was on house arrest. At a CHINS hearing on February 5, 2015, Mother admitted that the Children were CHINS. Mother was ordered to participate in home-based case management, home-based therapy, and supervised visitation. Mother was also ordered to submit to a substance-abuse assessment and drug screens.

[4] At some point in February 2015, Mother was evicted from the house in which she was living after the male individual was imprisoned and Mother could not pay the rent. Mother stayed with her sister until June 2015, at which time she moved to Milwaukee where she stayed with an aunt. Mother claims that she

held two jobs and obtained a two-bedroom apartment in Milwaukee. Initially, Mother believed the Children would be transferred to Milwaukee. In September 2015, after one of the Children ran away from the foster-home placement, Mother returned to Indianapolis.

[5] Back in Indianapolis, Mother lived with her cousin for approximately one year. Shortly after she returned, Mother met with Ted Amos, a therapist who was referred to provide therapy services to Mother as well as supervise Mother's visits with Child. Amos first met with Mother on September 18, 2015, and two days later supervised a visit between Mother and Child, which he believed "went well." *Transcript Vol. II* at 48. Thereafter, however, Mother did not successfully engage in therapy services or supervised visits. While Amos wanted to meet with Mother once a week, he met with her "at most" three or four times total. *Id.* Mother would either not show for scheduled appointments or she would arrive late. Amos testified that he never reached the point of setting goals with Mother.

[6] Through his limited contact with Mother, Amos's diagnostic impression was that Mother suffered depression. Amos feared Mother was a harm to herself after she contacted him on October 1, 2015, and told him that she was going to kill herself. Amos's last meeting with Mother was on October 6, 2015. Subsequent attempts to contact Mother and schedule additional appointments were unsuccessful. Ultimately, the referral for Amos's services was closed out for non-participation. Additional referrals were made for therapy services, but they were apparently closed out for non-participation. The record also reflects

that at some point Mother was prescribed medication for depression. Mother testified that she no longer takes the prescribed medication because she is no longer depressed.

[7] On March 17, 2016, the court held a permanency hearing that Mother did not attend because she had to work. The court noted that Mother had not engaged in reunification services, had not consistently provided drug screens, and had not consistently participated in home-based therapy. The court acknowledged that Mother had engaged in a substance-abuse assessment, but noted that Mother had not engaged in recommended follow-up services. A case manager informed the court that Mother had found employment and had located a potential residence. At that time, the permanency plan remained reunification.

[8] On July 7, 2016, the court held another permanency hearing. The court noted that Mother still had not consistently engaged in home-based case management services, home-based therapy, substance-abuse services, drug screens, or parenting time. At this hearing, a case manager reported that Mother was struggling to find employment and housing. It was explained to the court that DCS had yet to close out services, "in hopes that [Mother] is approved for disability and will have income to support her children." *Exhibits* at 67. Mother had visited with Child twice in May, but she also had two "no shows" and a missed visit because of a medical issue. *Id.* Upon the recommendation of DCS and the Guardian ad Litem (GAL), the court ordered that the plan for Child be changed from reunification to adoption. Thereafter, on August 1, 2016, DCS

filed a verified petition for termination of Mother's parental rights to Child (TPR Petition).[1]

[9] In September 2016, Mother moved from her cousin's home and rented a hotel room for approximately three months. In December 2016, Maggie Rose, a Recovery Coach Care Coordinator, received a referral to provide Mother with home-based services, the goals of which were to assist Mother in obtaining permanent housing and stable employment. At the time, Mother was living in a home with a male roommate.

[10] Initially, Rose met with Mother two to three times a week and she described Mother's effort as "moderate". *Transcript Vol. II* at 62. Rose had no problems communicating with Mother during this time. Rose noted that an obstacle Mother continually faced in obtaining employment was her prior felony conviction for welfare fraud. Notwithstanding, Rose helped Mother obtain employment. Mother, however, voluntarily left two different jobs. At a review hearing in January 2017, the court acknowledged Mother's efforts, noting that Mother had "recently re-engaged in services." *Exhibits* at 80.

[11] Shortly thereafter, in February 2017, Mother and her roommate "got put out" of the place they were living. *Transcript Vol. II* at 28. Around this same time, Mother stopped communicating with Rose and stopped engaging in all services.

---

[1] The TPR Petition did not involve Mother's other children involved in the CHINS proceeding.

Attempts to contact Mother were unsuccessful and Mother made no attempts to contact service providers or re-engage in services.

[12] In March 2017, Mother advised Rose that she was moving to Anderson. Although not verified by DCS, Mother testified that she and a male roommate shared rent of a place with one bedroom. Mother also testified that she obtained a job at an automotive plant and remained at that job until May, at which time she went to work for a pillow factory.

[13] An ongoing case manager with DCS was assigned to Mother's case in February 2017. This case manager reviewed the DCS case file pertaining to Mother. At the termination hearing, this case manager noted that throughout the course of the CHINS and subsequent TPR proceedings, DCS had made four to five referrals for home-based case-management services, more than one referral for substance-abuse services, and at least three referrals for home-based therapy. She explained that the need for multiple referrals was the result of unsuccessful completion of prior referrals and noted that Mother had not successfully completed any referrals.

[14] The trial court held a hearing on the TPR Petition on June 14, 2017. Based on her review of the DCS case file and her interactions with Mother, the DCS case manager testified that

> [Mother] failed to display stability both with employment and housing. She has not submitted to drug screens to show that she is not using substances. She's also not visiting her children and

DCS has not received a release of records to show that she is staying on top of her mental health.

[15] *Id.* at 101. The GAL, who had been assigned to represent Child's best interests since January 2015, recognized that at one point, Child was "very bonded" with Mother. *Exhibits* at 62. The GAL noted, however, that Mother had not visited Child in over a year and that it was Child's desire to be adopted by her foster mother. The GAL explained that she considered a number of factors in forming her opinion as to the best interests of Child. The GAL further opined that given Child's need for permanency, extending the time in which Mother can participate in services would be detrimental to Child. Both the GAL and case manager recommended termination of Mother's parental rights and opined that adoption by Child's foster mother was in Child's best interests. On June 26, 2017, the trial court entered its order terminating Mother's parental rights.[2] Mother now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

[16] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside its

___

[2] Father's parental rights were terminated on January 5, 2017.

judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[17] The trial court entered findings in its order terminating Mother's parental rights. When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[18] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D). DCS must establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence before the trial court can terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003).

Mother first challenges the trial court's findings as to subsection (b)(2)(B)(i). Here, the trial court found that DCS presented sufficient evidence to establish that there is a reasonable probability the conditions resulting in the Child's

removal or continued placement outside Mother's care will not be remedied. *See* I.C. § 31-35-2-4(b)(2)(B)(i). In making such a determination, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* In making this determination, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*.

[21] The court may also consider the parent's response to the services offered through DCS. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d at 210. Moreover, the failure to exercise parenting time demonstrates a "lack of commitment to complete the actions necessary to preserve [the] parent-child relationship." *Lang*, 861 N.E.2d at 372 (quoting *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002)) (alteration in original).

[22] Contrary to Mother's argument, the record demonstrates a clear chronology of Mother's failure to engage in services. Much of Mother's argument relies upon her own testimony at the termination hearing. The testimony of service providers and a review of court documents, however, tell a vastly different story. In Mother's own words, since her return from Milwaukee, she was "house jumpin'" until a few months before the termination hearing. *Transcript Vol. II* at 12. Mother has been evicted from several places. Mother has had periods of unemployment and has voluntarily left at least two jobs. Mother admitted that she used cocaine in December 2014 and again in the summer of 2016. Mother has not consistently participated in drug screens and has not engaged in recommended services following a substance-abuse assessment. Mother has wholly failed to meaningfully engage in home-based therapy and home-based case management and has failed to complete any referred services over the course of more than two years. The record supports the court's determination that there is a reasonable probability that the conditions resulting in Child's removal from the home will not be remedied. Mother's arguments to the contrary are simply requests to reweigh the evidence.

[23] Mother also challenges the trial court's finding that termination of her parental rights is in Child's best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). In so doing, the trial court must subordinate the interest of the parent to those of the child, and the court

need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[24] Here, both the GAL and the DCS case manager testified that termination of Mother's parental rights was in Child's best interests. Contrary to Mother's assertion, the GAL did not focus just on Child's happiness in reaching her conclusion. The GAL considered a number of factors, including Mother's lack of participation in services and failure to successfully address her housing, employment, and substance abuse issues in addition to Child's happiness and expressed desire to be adopted by her foster mother. The GAL further emphasized Child's need for permanency, noting that Child had been removed from Mother's care for more than two and one-half years and had not seen Mother in over a year. The GAL opined that giving Mother more time to complete services would be detrimental to Child. The case manager's conclusion was based on the fact that Mother failed "to display stability" both with employment and housing, that she did not regularly visit Child, and that

she was not complying with court-ordered services. *Transcript Vol. II* at 101. The trial court's conclusion that termination is in Child's best interests is not clearly erroneous.

[25] Mother also challenges the trial court's conclusion that there exists a satisfactory plan for the care and treatment of D.B. While the court must find that there is a satisfactory plan for the care and treatment of the child, "[t]his plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re S.L.H.S.*, 885 N.E.2d 603, 618 (Ind. Ct. App. 2008). Generally, adoption is a satisfactory plan. *Id.* Here, except for a brief stay in emergency shelter care, Child has been in the same pre-adoptive foster home since January 2015. Child is happy and comfortable in her placement, she is doing well in school, and prior behavioral issues have subsided. Child has bonded with and has expressed a desire to be adopted by her foster mother. There is a satisfactory plan for the care and treatment of Child.

[26] In sum, we affirm the trial court's order terminating Mother's parental rights to Child.

[27] Judgment affirmed.

May, J. and Vaidik, C.J., concur.